# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Robin Magee, | Court File No.: 11-CV-00949 (JRT/AJB) |
| Plaintiff, | |
| v. | |
| | **AMENDED COMPLAINT** |
| Trustees of the Hamline University, Minnesota, Donald Lewis, David Titus (in his individual capacity), and John Does 1-5, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## INTRODUCTION

Robin Magee sues for First Amendment retaliation under 42 U.S.C. § 1983, as well as intentional interference with her employment contract with Hamline University.

## PARTIES

1.      Plaintiff **Robin Magee** ("Magee") is an individual and a resident of Ramsey County, Minnesota.  At material times herein, Magee was an employee, a tenured law professor, at Hamline University School of Law ("Law School").

2.      Defendant **Trustees of the Hamline University, Minnesota** ("Hamline") is a Minnesota non-profit corporation that runs a college and law school located in St. Paul, Minnesota.  Hamline was founded in 1854.  But the law school was established in the latter part of the 20th Century.  There was a business relationship between Hamline and the St. Paul Police Department/its officers with regard to provided continuing education speakers and classes.

3.     Defendant **Donald Lewis** is an individual who upon information and belief is a resident of Ramsey County, Minnesota.  He has been Dean of Hamline University/Law School for approximately the last 3 years.

4.     4a. Defendant **David Titus** is a police officer with the City of St. Paul, Minnesota. He also holds a position with the St. Paul Police Federation.  4b. The St. Paul Police Federation is a Minnesota non-profit organization with its principle place of business in St. Paul, Minnesota.

5.     John Does 1-5 are reserved for other defendants to be identified and named.

## JURISDICTION

6.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over this matter, which arises in part under the laws of the United States including 42 U.S.C. §1983.  This Court has the authority to take jurisdiction over all other claims, as supplemental jurisdiction.

## FACTUAL STATEMENT

7.     Robin Magee is an African American woman who became an attorney and was hired as a Professor at Hamline in the Law School.

8.     When she was hired in 1990, she was the first tenured-tracked African American professor ever hired by Hamline University.

9.      Magee was granted tenure by Hamline in August 1994.  Tenure is a contractual right.  A tenured professor cannot be terminated at will, but rather, the contract between the professor and the school assured that the professor could only be terminated by following a set process and procedure, which is also contractual.

10.     Magee joined the public debate about race in Minnesota, race issues in the state courts, and race in issues of policing.  She was active with the NAACP, and otherwise active in her community, seeking equal treatment for African Americans.

11.     While teaching at the Law School, Magee taught classes about policing to numerous law students.  Magee's lessons covered topics such as police misconduct. Magee sought to expand the perspective of students attending the Law School, so that as they moved into their legal careers, they had some knowledge of different aspects of policing in America, including but not limited to police misconduct.

12.     Magee exercised her First Amendment right to expression (including her particular viewpoint, which as times is anti-police or viewed by police as anti-police) as well as her right to petition government for redress of grievances.

13.     For example,  on April 17, 2007, the Saint Paul Pioneer Press published a commentary of Professor Robin Magee in which she discussed a then recent and still unfortunate shooting of a St. Paul police officer.  (This is referred to herein as the April 17, 2007 commentary, but it is also at times referred to by defendants as the April 15 commentary, which is the same item.)

14.     Throughout the events alleged, David Titus was the President of the St. Paul Police Federation (SPPF) and an officer with the St. Paul Police Department (SPPD).

15.     As President of the police federation and 20-year veteran officer in the SPPD, David Titus influenced public-entity police policy—and directed police personnel (in the public entity).

16.     David Titus as public police officer was angered, outraged and offended by Plaintiff's April 17, 2007 commentary about a case involving a police officer.

17.     David Titus, by and through the SPPD and SPPDF, organized an interminable and blistering campaign and boycott against Professor Magee to destroy her reputation, silence her viewpoint and to strip her of her employment with Hamline.

18.     Directed by David Titus as police officer and also in conjunction with his role as President of the St. Paul Police Federation, organized and incited on and off duty police officers and their associates as well to inundate the Hamline President's Office with calls and other communications complaining about Professor Robin Magee's commentary and demanding that she be removed from her tenured faculty position at the University for her speech and her viewpoint.

19.     On Aril 21, 2007, David Titus, in which he identified himself as a "St. Paul police officer" and "president of the St. Paul Police Federation" (hereinafter all references to Titus are to his self-proclaimed status as "St. Paul police officer" and "president of the St. Paul Police Federation") also published an editorial in which he attacked Professor Magee specifically with regard to her teaching at Hamline University.

20.     That editorial stated, "any "professor of police practices" who is not aware that police officers are duty-bound to pursue suspicious behavior, and that a difference in size between the officer and the person he's pursuing doesn't justify the shooting of the officer, should have their fitness to teach re-examined.

21.     And it stated, "I hope Professor Magee confines her race baiting and cop-hating to her newspaper submissions and keeps it out of the classroom.  I can't imagine that the

students or the parents who may be paying to send their children to Hamline University would want that kind of indoctrination in the classroom."

22.    David Titus solicited and secured an editorial from then Saint Paul Police Department Chief David Harrington, which also was published on April 21, 2007, in the St. Paul Pioneer Press.

23.    On May 1, 2007, David Titus, by and through the SPPF, declared a boycott against Hamline until it took punitive action against Professor Robin Magee for her published commentary about police/the case.

23.    In that boycott resolution, David Titus indicated that he would urge SPPD Chief Harrington and the SPPD more generally to join the boycott against Hamline unless and until punitive action was taken against Professor Magee.

24.    Upon information and belief Titus was successful in obtaining assistance from other St. Paul Police officers and/or the Department (public entity) itself, to boycott Hamline or otherwise pressure it for punitive action against Magee.

25.    David Titus enjoyed a particularly close relationship to SPPD Chief Harrington and was perceived by members of the media and activists to determine many of the Chief's decisions.

26.    On or around May 1, 2007, David Titus posted the boycott resolution on the SPPF website—as a permanent item.  It has remained there to the day this amended complaint was drafted.

27.     On or around May 1, 2007, David Titus also posted Professor Magee's commentary and the purported responsive commentaries of Titus and Chief Harrington on the SPPF website.

28.     The Hamline resolution, Professor Magee's commentary as well as those of Titus and Chief Harrington responding to Magee's commentary are clustered in a dedicated and prominent place as permanent fixture on the main page of the SPPF website.[1]

29.     The dedicated "Magee posting" on the SPPF website is addressed to Chief Harrington of the public police entity.

30.     The resolution refers to its 'members,' which are clearly public police officers.  In no way does the resolution attempt to draw any distinction between those members as public police officials, as opposed to members of a private association.

31.     The resolution stated that "members of the Saint Paul Police Federation shall not participate in any future continued education, professional training programs or other similar that is a product of Hamline University."  The reference in this sentence to 'members' clearly includes those members in their public police status.

32.     The resolution also included the language, "[w]e strongly request that the police department discontinue and make no future contracts or agreements with Hamline University for educational purposes."  Upon information and belief from that point forward the public entity St. Paul Police Department (which is a department of municipality St. Paul, Minnesota) did not enter into contracts with Hamline.

---

[1] http://sppdfederation.com/(see left-side panel, "Hamline/Magee Resolution…click here) accessed at the time of filing the initial lawsuit as well as May 2012.

33.     The resolution is drafted to be clear that the conduct is inspired by Magee's protected speech and viewpoint.

34.     The boycott organized by Titus and effectuated by numerous public police officers, was designed and effectuated to punish Magee for her speech and viewpoint.

35.     Moreover, throughout spring semester of Hamline University 2007, from January to April, David Titus harassed a student in one of Professor Magee's courses, who worked with the SPPF.

36.     The student complained to Professor Magee that David Titus repeatedly approached her to demand information regarding Professor Magee's class, attempted to discredit Professor Magee and to intimidate the student into dropping Professor Magee's class.

37.     In April 2007, administrators of Hamline University, including the President of the university, Linda Hanson, convened to contemplate adverse actions against Magee in order to address the demands of the police.

38.     In April 2007, Professor Magee was summoned by the president of Hamline University to account and explain her published commentary.  Magee was able to stave off this assault on her position.  However, this would change once Dean Lewis was hired, and the police agenda would be effectuated.

39.     The Minnesota Department of Revenue hires and did employ during all alleged events recently-retired SPPD officers.

40.     David Titus knew at least one employed retired officer working at the Minnesota Department of Revenue during relevant events.

41.     On or about 2007, the Minnesota Department of Revenue initiated an investigation of Professor Magee. The audit was unprecedented and baseless.

42.     Hamline assisted in the MnDOR investigation, including providing confidential data relating to Professor Magee, but did not inform Professor Magee of its participation at the time.

43.     During 2007, Professor Magee became the subject of a criminal investigation regarding matters that had previously been extensively discussed and well settled between Professor Magee and the Minnesota Department of Revenue (MnDOR).

44.     MnDOR suddenly stopped filing Commissioner's Returns for Magee.

45.     During 2008, MnDOR secured Professor Magee's banking information and engaged in an extensive investigation of her financial circumstances.

46.     In 2008, Professor Magee attempted to defend herself against the investigation and it appeared the investigation would go no further.

47.     However, on or about September 9, 2009, on the morning after a local police officer was killed in the line of duty, the Ramsey County Attorney filed an 11-felony count complaint against Robin Magee alleging various felony tax law violations.

48.     The felony tax charges against Magee were later dropped and gross misdemeanors were substituted.

49.     On or about September 9, 2009, David Titus sent an email to both Donald Lewis, the Dean of Hamline University School of Law, and Linda Hanson, president of Hamline University. In his communication Titus called their attention to his boycott and urged

Hamline to take punitive action against Professor Magee and remove her from the classroom.

50. On September 10, 2009, Dean Lewis responded to David Titus' email, informing Titus that he needed to pursue a set procedure in order to terminate Professor Magee. This, among other evidence, shows a meeting of the minds.

51. This email, as well as other evidence, shows that Hamline made the decision to terminate Magee prior to instituting its claimed "due process" proceedings for de-tenuring.

52. The reason that Hamline eventually gave for de-tenuring and/or terminating Magee was pretext.

53. On September 11, 2011, Dean Lewis scheduled an off-campus meeting with Professor Magee to insist on a suspension of her teaching responsibilities. Although this would later be termed a 'leave of absence' by Hamline, it was not voluntary. And Dean Lewis failed to follow the contractual obligations of the Law School before suspending Magee from classroom teaching. (See discussion of contract and Handbook, below.)

54. During the September 11, 2009 meeting, Dean Donald Lewis told Professor Magee that the criminal charges would not be dismissed because she was "not liked" by authorities.

55. Don Lewis engaged in communications with the Ramsey County Attorney's Office or other 'authorities' and upon information and belief Don Lewis participated in other conversations with the 'authorities' about the criminal charges.

56.     On the day the criminal charges against Professor Magee were publicly announced, September 9, 2009, the local media stories included a statement issued by the Hamline University communications office declaring the tax prosecution of Professor Magee a "personal matter" that the Hamline would not discuss further.

57.     On September 10, 2009, the Hamline University public relations and communication office advised Dean Lewis to not issue any other further comment regarding the charges against Professor Magee as they believed the charges were a one-day story that would not continue if not commented upon.

58.     The communication office was correct. The prosecution was a single-day story in the local media.

59.     However, on September 10, 2009, the same day Dean Lewis was advised by Hamline against making any public comment, Lewis sent an email to every possible Hamline student and alum regarding the prosecution of Professor Magee.

60.     Lewis also placed a statement about Magee on the main webpage of the Hamline University School of Law webpage.

61.     In the public statement posted on the Law School's main webpage, Dean Lewis intimated that Professor Magee's continued presence in the classroom would be detrimental to Hamline students. This was the very position that Titus and the SPPF had publicly taken.

62.     Law School students and alums were disturbed by the web post. At least one reported her alarm to Dean Lewis, explaining that the statement appeared to deny Professor Magee the presumption of innocence. Indeed, the felony charges which had

been the thrust of the public announcement were not supported by evidence and were eventually voluntarily dismissed by the criminal prosecutor. Magee was innocent of all of the felony charges.

63. On October 21, 2009, a patron in Golden Thyme coffee shop in St. Paul, Minnesota observed and overheard a conversation Dean Lewis had with the then-Hamline University School of Law associate dean, Carol Swanson and an unnamed man.

64. The coffee shop patron overheard Dean Lewis and Associate Dean Carol Swanson discussing Professor Magee.

65. Dean Lewis and Carol Swanson discussed how Professor Magee's commentary on policing had had created enemies on the police force who had demanded that Hamline take action against her. They were discussing filling a position at Hamline (and it can be inferred from the context they were discussing Magee's).

66. Dean Donald Lewis formally joined the faculty in 2008 from private practice.

67. He had begun his career as a tax prosecutor.

68. Dean Lewis is African American. Don Lewis developed a reputation among certain segments of the community for being hired by private corporations when they wanted to get rid of a high-profile African American employee.

69. In 2010 as in prior years, Hamline University adopted through Hamline's Trustees a Handbook of policies and procedures relating to Magee's employment, tenure, and the de-tenuring process.

70.    The Faculty Handbook is expressly contractual in nature.  It is also contractual as a matter of law.[2]

71.    Section 6 of the Handbook described the 'good cause' nature of the tenure contract, specifically stating, "[a]fter a faculty member has obtained tenure, such faculty member shall continue in service and hold his or her position and shall not be discharged, demoted, or suspended except for cause after a hearing."

72.    Section 6 sets forth the only cause for discharge, demotion, or suspension of a tenured faculty member that was at issue in this case:  "academic misconduct or other misconduct directly and substantially related to the fitness of the faculty member in his or her professional capacity as a teacher or researcher; or demonstrated lack of academic competence."

73.    Section 6 also states, "Discharge, demotion, or suspension will not be used to restrain faculty members in their exercise of academic freedom, as defined in Section 3 [of the Handbook] above, or other rights as American citizens."

74.    Section 3, relating to Academic Freedom, specifically states,

> The faculty enjoys full academic freedom. These rights generally include those embodied in the Statement of Principles on Academic Freedom and Tenure approved by the American Association of University Professors and the Association of American Colleges and Universities.

> 3.2    Research and Publications.

> Each faculty member is entitled to full freedom in research and in the publication of the results, subject to the performance of the faculty member's other academic duties. Each faculty member is entitled to

---

[2]The Minnesota Supreme Court has set forth a 4-part analysis to determine whether a handbook is contractual in nature, and those 4 tests are satisfied in this case.

freedom in the classroom in discussing his or her subject. When a faculty member speaks or writes, he or she should be free from institutional censorship or discipline. All faculty members should remember that the public may judge the legal profession and the Law School by his or her utterances. Hence, all faculty members should make every effort to be accurate and to show respect for the opinions of others.

75. Section 8 of the Handbook sets forth the process that must be used in there is an attempt to de-tenure a tenured faculty member such as Magee.

76. The Handbook provides that "no tenured faculty member shall be discharged, demoted, or suspended except for the causes stated in the Faculty Handbook."

77. As noted above, first Hamline and Lewis made the decision to terminate Magee. Then, Hamline set about to engage in what amounted to a sham process, trying to make it appear that Section 8 of the Handbook was being followed.

78. The allegation in Paragraph 77 is supported by substantial evidence, some of which was discussed in the Hamline proceedings (which were transcribed, and which are further discussed below).

79. Inter-Hamline emails obtained by Professor Magee during the Section-8 proceedings included evidence that the decision was made first, and the process instituted later. These include but are not limited to:

a. James Coben was the head of the Faculty Appointments, Tenure and Promotion Committee (ATP Committee), which had a role defined by Section 8.

b. Section 8.2 states that the ATP Committee will meet with the faculty member. Long before that meeting occurred, Coben, via email dated January 20, 2011 confirmed to that Committee their agreement that Coben would prepare a list of handbook provisions relating to discharge, and that they would discuss it at the next meeting set to review the status of Magee's criminal case.

c.     On February 7, 2011, Coben wrote to Dean Lewis that in anticipation of the outcome of Magee's criminal trial the ATP Committee had reviewed the handbook provisions relating to discharging a tenured faculty member. Coben made recommendations for managing a due process administrative hearing for when the Dean formally charged Magee under Section 8. Coben told the Dean that the ATP Committee should not engage in informal settlement talks unless the Dean was prepared promptly thereafter to file charges against Magee following that meeting.

d.     Following the verdict in Magee's criminal trial, Coben suggested an email to all students, "We are disappointed to learn today that [Magee] was found guilty of four gross misdemeanor charges arising from her failure to file state income tax returns. Her conduct that led to the guilty verdict is contrary to the values of our law school where we expect our colleagues to lead by example in teaching respect for the rule of law. In the coming weeks, I will work with the faculty committee on ATP to determine any next steps that should be taken by the school."

e.     On February 8, 2011, Coben shared with the ATP Committee his legal research regarding discipline of licensed attorneys for failure to file tax returns. (Magee was not licensed in Minnesota, so the Minnesota Lawyers Board lacked jurisdiction over her.)

f.     Coben also stated in that email, "While Robin isn't licensed in Minnesota, the policy argument expressed by the court is helpful in thinking through the ethical implications of her failure to file (not even considering the criminal conviction for same)." Ethics considerations were clearly not the issue, since no one contacted the state in which Magee was licensed.

g.     Coben also stated in that email "I'd like to revisit … the scope of possible charges that we might recommend to Don [Lewis]," and he attached a lengthy memorandum prepared by former Hamline Law School dean Marie Failinger, which alleged employment deficiencies of Professor Magee (relating to course work, class work, etc.).

h.     By email dated that same day (February 8, 2011), former Dean Failinger herself admitted that the attached memorandum had been prepared the previous Spring in anticipation of Magee being found guilty in the criminal case, "which apparently she was today."

i.     On February 22, 2011, the ATP Committee reached a "consensus" regarding Professor Magee.

j.     By email dated February 26, 2011, the ATP committee indicated it was "up to date" with what the Dean [Lewis] was doing.

k.    By email dated March 13, 2011, Coben told all Law School faculty members (which would comprise the 'faculty jury' during Section 8 proceedings) that there would be a meeting to discuss 'procedural requirements' for the upcoming proceedings. He stated that 18 law faculty would be needed for a 'quorum' to de-tenure Magee.

l.     In the same email, Coben explained the process for formal de-tenuring charges.

m.    The pre-meeting with the 'faculty jury' was held and according to a March 26, 2011 email from Coben, "productive."

n.    In numerous communications, Coben took it upon himself to ensure a quorum would be present to de-tenure Magee.

o.    After the process had been fully "dress-rehearsed" within Hamline, on April 13, 2011, Dean Lewis sent a sham email claiming that he was requesting that Coben's ATP Committee commence an informal inquiry to determine whether proceedings should be undertaken to discharge Professor Magee.

p.    In response to concerns, Attorney Wassberg of Hamline communicated that members of the 'faculty jury' would be defended and indemnified by Hamline if that became necessary.

q.    On April 29, 2011, the ATP Committee led by Coben conducted a sham meeting with Magee and her counsel. As they had prior agreed they would do (long prior to the purported 'meeting') the ATP Committee recommended that Dean Lewis move forward with formal procedures to de-tenure Magee.

80.    Dean Lewis then issued formal charged on or about May 11, 2011.

81.    Pursuant to contractual Section 8, Magee exercised her right to a hearing

82.    Magee also exercised her right to remove Coben from the faculty jury. By email dated May 27, 2011, Coben indicated he would ignore that removal and continue to act as

"convenor" (a role that did not exist under Section 8 and was objected to by Professor Magee) for the Section 8 proceedings and the faculty jury. This was in actuality a 'chair' role which drove the Section 8 proceedings forward.

83.     Coben continued to count heads and 'communicate' with faculty members until he was assured that there would be a quorum present to de-tenure Magee.

84.     Section 8.3 prohibits the Dean from participating in either the deliberation or voting by tenured Faculty. Based on all of the evidence of which Magee is aware (see all Paragraphs herein), Magee alleges that the 'communications' with the faculty jury prior to the commencement of the hearing were indeed determining whether the votes would be there to de-tenure Magee.

85.     Hamline University, by and through Dean Donald Lewis, initiated formal de-tenuring charges, pursuant to the Law School Faculty Handbook, Section 8.2.C (the "Charges"), which requires the charges be framed "with reasonable particularity."

86.     Hamline alleged that that the misdemeanor criminal convictions and the conduct underlying them made Professor Magee unfit as a teacher and researcher in that the convictions demonstrated disrespect for and disregard of law and represented a violation of Hamline's core values that detracted from Hamline's reputation and ability to further Hamline's mission.

87.     Faculty Handbook Section 1.2 expressly excludes Hamline's core values and mission statements as provisions of the tenure contract.

88.     The Charges against Professor Magee, each, and in their entirety, essentially allege that Professor Magee acted contrary to Hamline's mission statement and core values.

89. The Faculty Handbook considers and dismisses reputational harm as a basis for terminating and de-tenuring faculty. And the alleged reputational harm at issue here (whether Magee should be permitted as a Hamline Law Professor to criticize St. Paul Police) triggers First Amendment protections.

90. The charges did not articulate any basis for de-tenuring and terminating a faculty member. As such, the process used by Hamline was invalid as a matter of law.

91. Moreover, Hamline presented no evidence of actual diminished reputation.

92. The Faculty Handbook, Section 8, requires the Hearing Committee (the "faculty jury" or "Hearing Committee") to operate independent of the Dean and be impartial.

93. The Hearing Committee did not operate independently from the Dean, as set forth above.

94. The Dean hand-picked James Coben as the initial chair of the faculty jury, the "convenor," as set forth above.

95. James Coben, rather than operating independently of Dean Lewis as chair of the Hearing Committee, was working as the agent of Dean Lewis to insure Magee would be de-tenured.

96. Notwithstanding James Coben's role as agent for the Dean (the 'prosecutor' in the internal proceedings) and deep-seated bias against Professor Magee and his extensive integration in the "prosecution" of Professor Magee, James Coben refused to remove himself as chair and a member of the Hearing Committee.

97. Professor Magee was forced to use her only "preemptory challenge" to remove him from the Hearing Committee.

98.     Other faculty members with known biases refused to remove themselves and remained members of the Hearing Committee.

99.     For example, Professor Carol Swanson was overheard identifying   Professor Magee as a problem for Hamline because of Magee's work around the police such that she needed to be replaced on the faculty.    Professor Swanson also assisted the Dean in drafting the Charges against Magee.

100.    Professor Swanson never disclosed this bias during "voir dire" and refused to remove herself from the Hearing Committee.

101.    Section 8 provides that Hamline faculty and administrators will be made available upon request as witnesses.

102.    Professor Magee requested that Hamline University President Linda Hanson appear to provide testimony.  This was important to Magee's defense, since she was attempting to show that First Amendment-protected speech or conduct has inspired the de-tenuring process, and President Hanson had received most of the communications from police.

103.    The selected Hearing Committee Chair (this was not Coben, but a Chair who prior to and during the hearing acted like an arbitrator) "ordered" the President to appear and testify.

104.    President Hanson refused to appear and provide testimony.

105.    The Chair (arbitrator) stated that he thought there should be sanctions against Hamline for its disobeying his order.  And Magee contends that in a hearing providing due process, there would have been.  But the proceedings marched on to conclusion.

106.   Magee objected, and President Hanson's refusal to appear (or Hamline's refusal to produce her) prevented Magee from making her defense in the Section 8 hearing.

107.   Magee had already filed this lawsuit by the time of the Hamline Section 8 proceedings.   The refusal to produce President Hanson also means that at the time of preparing this First Amended Complaint, Magee lacks substantive evidence regarding President Hanson's communications with police.

108.   The Faculty Handbook contractually guarantees to faculty subject to termination and de-tenuring a full "due process hearing."  (Section 8.3D).

109.   Hamline effectively denied Professor Magee the ability to *voir dire* hearing committee members.

110.   Section 8.3E requires that the hearing be "private" unless the faculty member requests an open hearing.  Magee did not request an open hearing.  Section 8.3N states, "Except for such simple announcement as may be required, covering the time of the hearing and similar matters, public statements and publicity about the case by either the faculty member, administrative officers, or other members of the Faculty will be avoided so far as possible until the proceedings have been completed, including consideration by the President."  Consideration by the President had *not* yet occurred by the time Hamline and the Dean filed their motions to dismiss in this case.

111.   Magee relied on the contractual representation at Section 8.3E/N that the matter was be private (confidential).

112.   Hamline made numerous unnecessary, unjustified and prohibited public disclosures regarding the de-tenuring processes initiated against Professor Magee,

including but not limited to the motions to dismiss publicly filed by Hamline and Dean Lewis in this lawsuit. Magee was concerned about amending her complaint given the confidential nature of the information she needed to be able to do so. Magee is only now amending her complaint because Hamline and the Dean disclosed confidential information as noted above.

113. Hamline and Dean Lewis did not request Magee's permission to make the public disclosures that it made, and such disclosures violate Section 8.3E/N.

114. The formal Charges had been based upon the criminal charges/conviction. On July 20, 2011, the Hamline faculty voted to sustain charges against Professor Magee. Rather than basing its decision on any of the formal Charges (which Magee had successfully litigated against), the Hearing Committee focused on Magee's failure to file tax returns that were *not* part of the criminal case. Magee alleges this as evidence of a pre-determined outcome.

115. In a letter dated July 21, 2011, Dean Lewis terminated Professor Magee. This breached the contract. Magee was still entitled to one more review – appeal to the President pursuant to Section 8.4.

116. Section 8.4 does not provide a deadline for filing said appeal.

117. Magee immediately communicated to the Dean and Hamline that she would in fact be appealing.

118. The Dean's immediate discharge of Magee based only on the faculty jury's determination breached the contract.

119.   Further, as noted above, the matter was private and confidential until such time as the President had reviewed the appeal.

120.   Hamline stopped Magee's pay and benefits.

121.   Apparently acknowledging her right to file an appeal, Hamline kept Magee's office in place until several months ago, when they threatened to deliver 50+ boxes to her attorney's office.   Upon information and belief Hamline has now totally dismantled Magee's professorial office.

122.   This treatment of Magee breaches the contract found in the Handbook/tenure process.

123.   Hamline University and/or Dean Lewis breached the contract by:

    a.   Suspending Professor Magee from classroom teaching in September 2009 in the absence of Handbook, Section 8 process.

    b.   Failing to engage in good faith informal discussions with Professor Robin Magee as required by Section 8.2.

    c.   Terminating Professor Magee's tenure in the absence of "adequate cause."

    d.   Failing to provide proper service of the complaint as set forth in Section 8.3.

    e.   Failing to allow Plaintiff a "full due process hearing" as required by Section 8.3.

    f.   Failing to provide Professor Magee with an unbiased Hearing Committee/jury.

    g.   Failing to "afford" Plaintiff with "an opportunity to obtain necessary witnesses and documentary or other evidence.

    h.   The Handbook requires the Hamline Administration to cooperate with the Hearing Committee in securing witnesses and making available documentary and other evidence.

i.    Hamline violated its contract/promise to Magee of Academic freedom.

j.    Making unnecessary and unjustified public disclosures regarding the internal process pursued against Professor Magee, thereby violating Magee's right to confidentiality specifically provided for in the contract.

## COUNT I
## Violation of 42 U.S.C. §1983
## (Against all Defendants)

Plaintiff realleges all facts in this complaint as if fully set forth herein.

124.   This claim arises under Title 42 of the United States Code (Civil Rights Act of 1964, as amended), including but not limited to §1983.

125.   Defendants acted alone and/or together (2 or more in concert) to violate Plaintiff's rights.

126.   Defendants deprived Plaintiff of her rights, privileges, and immunities secured by the United States Constitution, and specifically the Fourteenth Amendment to the United States Constitution, in conjunction with other rights, including but not limited to the following clearly established rights:

a.    First Amendment retaliation (against all defendants).  Plaintiff exercised her right to free speech, to criticize government.  She was retaliated against, and the adverse consequences would chill a person of ordinary firmness. This retaliation includes prior restraint of speech.

b.    Violation of right to petition government for redress of grievances.

127.   Defendants (and each of them) knew they were violating the federal law and constitutional rights of Plaintiff and/or acted with deliberate indifference to the rights of Plaintiff as noted above.  The Defendants acted under color of law of a statute, ordinance, regulation, resolution, policy, custom or usage when they deprived Plaintiff of her

Constitutional rights, privileges, and immunities, and the private defendants acted in concert with the public defendants to effectuate a common scheme or plan to violate Magee's constitutional right to freedom of expression or to petition government for redress of grievances.

128.    As a direct and proximate result of the Defendants' conduct, inaction, policy or customs as set forth in more detail above, Plaintiff suffered the deprivation of her constitutional and/or federal statutory rights and suffered damages including loss of business, legal fees, costs of performing work and other harm.

129.    By reason of the foregoing, Magee was damaged, the damage was proximately caused by defendants, and Magee is entitled to judgment against each defendant, and jointly and severally, in excess of $50,000.

## COUNT II
### (Intentional Interference with Employment Contract)
### (Against Dean Lewis)

Plaintiff incorporates all facts prior alleged herein.

130.    A valid contract existed between Magee and Hamline University.    Defendant Lewis knew about Magee's employment contract with Hamline.    Defendant Lewis maliciously interfered with Magee's employment contract.    Lewis intentionally induced Hamline to suspend and terminate Magee.    Dean Lewis' conduct was not justified and was illegal (working together with police to retaliate against Magee for her exercise of First Amendment rights).

131.    The intentional interference caused the suspension and then the termination of Magee's employment contract and tenure.    As a direct or proximate result of the

defamation, Magee has been damaged in an amount in excess of $50,000 to be proven at trial.

**COUNT III**
**(Breach of Employment Contract)**
**(Against Hamline University)**

Plaintiff incorporates all of the allegations prior herein.

132.    Magee and Hamline entered into an employment contract.  Magee, for her part, performed on the contract.

133.    Hamline materially breached the contract.

134.    As a direct and proximate result of the breach, Magee was damaged in an amount in excess of $50,000 to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief in the form of an injunction against defendants, and each of them, and/or as follows:

1.    Issuing a temporary, preliminary and/or permanent injunction as described in Count I, above.

2.    Awarding Plaintiff her damages, and all costs and attorney fees as appropriate in this action.

3.    Such other relief as the Court deems advisable and necessary.

Dated:  January 2, 2013

**WARD LAW GROUP**


By     s/Damon L. Ward          
Damon L. Ward, I.D. #221442
301 Fourth Avenue South
378 Grain Exchange Building
Minneapolis, MN  55415
Telephone:  (612) 353-9770
Fax:  (866) 759-6030
Cell: (612) 282-3060

-and-

**GOINS LAW OFFICES, LTD.**
Albert T. Goins, Sr. (#126159)
301 Fourth Avenue South
378 Grain Exchange Building
Minneapolis, MN 55415
Telephone:  612-339-3849
Facsimile:  612-339-3853

**ATTORNEYS FOR PLAINTIFF**
**ROBIN MAGEE**